UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TAMER HASSAN, SAID MASSOUD, and
HAMZA SELLAM,

                   **PLAINTIFFS,**            **CASE NO.**

      -against-

                                               **COMPLAINT**

THE CITY OF NEW YORK;
NEW YORK CITY TAXI AND LIMOUSINE      **JURY TRIAL DEMANDED**
COMMISSION; JOSEPH DEFRANCIS,
in his official capacity; ERIC L. FINKELSTEIN,
in his official capacity; IRA GOLDAPPER, in
his official capacity; and, DIANA M. PENNETTI,
in her official capacity,

                 **DEFENDANTS.**
-----------------------------------------------------------------X

       Plaintiffs Tamer Hassan, Said Massoud, and Hamza Sellam, through undersigned counsel,

complain about Defendants City of New York, New York City Taxi and Limousine Commission,

Joseph DeFrancis, Eric Finkelstein, Ira Goldapper, and Diana Pennetti, as follows:

## INTRODUCTION

      1.    This is an employment discrimination case involving hostile work environment

claims based on the Plaintiffs' race, religion, national origin, and age, and retaliation claims,

including retaliatory termination of employment, in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1983 ("Section 1983"); and the New

York City Human Rights Law, Title 8 of the Administrative Code of the City of New York

("NYCHRL"), as amended.

## JURISDICTION AND VENUE

      2.    The Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §

1331 and 28 U.S.C. § 1343.

3.     The Court has jurisdiction over Plaintiffs' NYCHRL claims pursuant to 28 U.S.C.
§ 1367. Plaintiffs' NYCHRL claims are so closely related to Plaintiffs' claims brought under Title
VII and Section 1983 that they form part of the same case or controversy as those terms are defined
pursuant to Article III of the United States Constitution.

4.     The Defendants are subject to personal jurisdiction in New York.

5.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §
1391(b)(2), and Title VII's special venue provision, 42 U.S.C. § 2000e-5(f)(3), because the events
or omissions giving rise to the claims occurred within this judicial district.

## **THE PLAINTIFFS**

6.     Plaintiff Tamer Hassan ("Hassan") is originally from Egypt and his race is Arab.

7.     Hassan is an adherent of the Muslim faith, over the age of forty, and is a resident
of Kings County in New York State.

8.     Hassan worked as an inspector for Defendant New York City Taxi and Limousine
Commission from November 13, 2017 until November 2018 when he was illegally fired by
Defendants for complaining about the discriminatory treatment he and others were subjected to.

9.     Plaintiff Said Massoud ("Massoud"), who is American by birth, is of Egyptian
descent and his race is Arab.

10.     Massoud is an adherent of the Muslim faith, over the age of forty, and is a resident
of Richmond County in New York State.

11.     Massoud worked as an inspector for Defendant New York City Taxi and Limousine
Commission from November 13, 2017 until November 2018 when he was illegally fired by
Defendants for complaining about the discriminatory treatment he and others were subjected to.

12.     Plaintiff Hamza Sellam ("Sellam") emigrated to the United States from Algeria and his race is Arab.

13.     Sellam is an adherent of the Muslim faith and a resident of Kings County in New York State.

14.     Sellam worked as an inspector for Defendant New York City Taxi and Limousine Commission from November 13, 2017 until November 2018 when he was illegally fired by Defendants for complaining about the discriminatory treatment he and others were subjected to.

15.     Hassan, Massoud, and Sellam will be referred to herein collectively as "the Plaintiffs."

## THE DEFENDANTS

16.     Defendant City of New York ("the City") is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

17.     At all times relevant to this Complaint, the City was Plaintiffs' "employer" as that term is defined by Title VII and NYCHRL.

18.     The City maintains Defendant New York City Taxi and Limousine Commission ("TLC"), a duly authorized municipal agency responsible for licensing and regulating New York City's Medallion (Yellow) taxi cabs, for-hire vehicles (community-based liveries, black cars and luxury limousines), commuter vans, and paratransit vehicles.

19.     At all times relevant to this Complaint, TLC was Plaintiffs' "employer" as that term is defined by Title VII and NYCHRL.

20.     Defendant Joseph DeFrancis ("DeFrancis") has worked at all relevant times to this lawsuit as TLC's Chief of Patrol, and as such, at all relevant times was acting under color of state law and within the scope of his employment with Defendant City of New York.

3

21.     Defendant Eric L. Finkelstein ("Finkelstein") worked at all relevant times to this lawsuit as the First Deputy Chief of TLC's Uniformed Services Bureau, and as such, at all relevant times was acting under color of state law and within the scope of his employment with Defendant City of New York.

22.     Defendant Ira Goldapper ("Goldapper") has worked at all relevant times to this lawsuit as TLC's Director of Discipline and Labor Relations, and as such, at all relevant times was acting under color of state law and within the scope of his employment with Defendant City of New York.

23.     Defendant Diana M. Pennetti ("Pennetti") has worked at all relevant times to this lawsuit as TLC's Deputy Commissioner. Her duties include management of TLC's Uniformed Services Bureau, which includes the Safety and Emissions Inspection Division, and the Enforcement Division.

24.     Defendant Pennetti is the highest senior official at TLC after the Commissioner and as such, at all relevant times was acting under color of state law and within the scope of her employment with Defendant City of New York.

25.     The City, TLC, DeFrancis, Finkelstein, Goldapper, and Pennetti, will be referred to herein collectively as "the Defendants."

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

26.     On June 14, 2019, each Plaintiff filled a Charge of Discrimination, alleging that he had been subjected to illegal discrimination and retaliation during his employment at TLC, with the United States Equal Employment Opportunity Commission ("EEOC").

27.     The EEOC issued Right-To-Sue letters to each Plaintiff on June 8, 2020.

28.     This action commenced within ninety (90) days of Plaintiffs' receipt of their Notice of Right to Sue Letters issued by the EEOC.

## FACTS RELEVANT TO ALL CLAIMS

**PLAINTIFFS APPLY FOR TLC INSPECTOR POSITION**

29.     Hassan worked as a taxi driver in New York City for fifteen (15) years before he decided to apply for a position as a TLC inspector in or about 2014.

30.     Massoud worked as a driver in the commercial black car industry in New York City for twelve (12) years before he decided to apply for the TLC inspector position in 2014.

31.     Hamza worked as a taxi driver in New York City for three (3) years before he decided to apply for a position as a TLC inspector in or about 2014.

32.     Before they applied for the TLC inspector position, each Plaintiff came into contact with TLC employees during the time they worked as for-hire vehicle drivers in New York City.

33.     TLC inspectors are members of TLC's Uniformed Services Bureau, which includes the Safety and Emissions Inspection Division, and the Enforcement Division.

34.     The primary mission of TLC's Enforcement Division is to maintain public safety by deterring the illegal operation of unlicensed vehicles, and ensuring compliance with TLC rules and regulations, New York City vehicle traffic laws, as well as other applicable municipal laws.

35.     According to the City's website, TLC's Enforcement Division consists of 240 inspectors and supervisors who perform "on-street enforcement of [sic] TLC-licensed drivers and vehicles as well as unlicensed for-hire operators who pose a serious threat to public safety." *See* https://www1.nyc.gov/site/tlc/about/enforcement.page (last visited on August 3, 2020).

36.     Each Plaintiff decided to apply for the TLC inspector position in an effort to obtain a job in the City's civil service, which promises economic security and other benefits not afforded

to for-hire vehicle drivers in New York City, such as health care insurance and an opportunity to save for retirement.

37.     In 2014, each Plaintiff paid a fee online to register to take Civil Service Exam 5046, which is the exam for the TLC inspector position.

38.     After taking the Civil Service Exam 5046, each Plaintiff was put on the "DCAS list," which, upon information and belief, means they were eligible for hire by TLC or any other New York City municipal agency starting in 2016.

39.     In or about the Spring of 2017, each Plaintiff received a letter from TLC stating that he was being considered as a candidate and each Plaintiff was invited to an interview for the TLC inspector position.

40.     During the Summer and early Fall of 2017, each Plaintiff took required medical tests, psychological tests, and underwent a thorough background check, all of which they passed.

41.     Before becoming employed as a TLC inspector, each Plaintiff was expected to work for six (6) months as a trainee, which was a paid position, after which time he was supposed to become a regular TLC employee, and therefore eligible for additional benefits, such as an increase in the regular pay rate, as well as hazard pay, and workers' compensation benefits should they become injured at work.

42.     In reality, because of their race, national origin, and religion, Sellam, Massoud and Hassan were each subjected to a discriminatory hostile work environment and retaliation after they complained about discriminatory mistreatment perpetrated by TLC instructors and supervisors, which occurred throughout their tenure working at TLC, both during and after the training period. Each Plaintiff was illegally fired in or about November 2018 for engaging in protected activity. Hassan and Massoud were also harassed because of their age.

**HOSTILE WORK ENVIRONMENT DURING SIX-WEEK CADET TRAINING AT BRONX COMMUNITY COLLEGE**

43.     The hostile work environment Plaintiffs were subject to at TLC began on their first day of training.

44.     During an initial lecture, Plaintiffs' supervisors and instructors introduced themselves, and discussed their work experience and expectations for the TLC training program.

45.     At all relevant times, Plaintiffs' primary supervisors and instructors were senior management staff of TLC's Uniformed Services Bureau, Enforcement Division

46.     At all relevant times to this litigation, and to this day, the majority of the senior management staff of TLC's Uniformed Services Bureau, Enforcement Division are white, former New York City Police Department ("NYPD") officers.

47.     Defendant Finkelstein ("Finkelstein"), First Deputy Chief of TLC's Uniformed Services Bureau, addressed Plaintiffs' class on their first day.

48.     During his remarks, Finkelstein made a point of noting that he is a former NYPD Organized Crime and Antiterrorism Taskforce member.

49.     When he said the word, "Antiterrorism," Defendant Finkelstein inexplicably pointed his finger directly at Massoud and a few other Arab/Muslim/foreign-born cadets with whom Massoud was sitting in the audience, including Hassan and Sellam.

50.     Defendant Finkelstein continued to point out Plaintiffs and other Arabs/Muslim/foreign-born trainees in the class, while continuing his discussion of his alleged anti-terrorist activities, including describing travel and work on alleged terrorist-related issues in the Middle East.

51.     Being linked to Middle Eastern terrorists on the first day of work by one of the highest ranking TLC supervisors involved in their training was very disturbing for Plaintiffs.

52.     Starting on their first day at TLC, Plaintiffs began to actively avoid Defendant Finkelstein, which they did with limited success.

53.     When they did encounter him, Finkelstein subjected Plaintiffs to discriminatory comments.

54.     For example, whenever Defendant Finkelstein saw Plaintiffs or other Arab/Muslim/foreign-born cadets, he would proclaim: "the Arab League has arrived!"

55.     Beyond Finkelstein's discriminatory comments and unfriendly demeanor, he intimidated Plaintiffs and other TLC cadets by wearing a gun to work, which is prohibited by TLC rules, but condoned by TLC senior management, a majority of whom used to work for NYPD.

56.     For example, Defendant Pennetti, TLC's Deputy Commissioner, is a former NYPD lieutenant who also regularly wears her gun to work at TLC.

57.     Defendant Finkelstein was not the only TLC supervisor to engage in the discriminatory harassment of Plaintiffs and other Arab/Muslim/foreign-born inspector-trainees.

58.     For example, on a freezing day, Inspector Victor E. Donoso ("Donoso"), an instructor, made the cadets run and do sit ups on a track that was infested with goose manure.

59.     While Plaintiffs were doing push-ups, and Donoso could see their hands pressing into the feces, Donoso said out loud, "You guys should be used to this," specifically directing his comment at Massoud and other Arab/Muslim/foreign-born cadets who were in close proximity, including Ramy Sorial ("Sorial"), who, upon information and belief, is a foreign-born Arab.

60.     At the Bronx training facility, Hassan was also singled-out because of his age.

61.     On the first day of training, Inspector Robert Sejeva ("Sejeva") announced that Defendant Deputy Commissioner Pennetti intended to impose a prohibition that would prevent

anyone over the age of thirty-five (35) from applying for a position as a TLC inspector, and when he said this, he pointed at Hassan and others who appeared to be older.

62.     Hassan was repeatedly harassed by TLC supervisors and instructors at the Bronx training facility, who constantly humiliated him and encouraged him to resign.

63.     For example, Captain Forest J. Hamlor ("Hamlor") told Hassan on a regular basis that he should resign because, Hamlor alleged, other cadets complained that Hassan had bad body odor, which Plaintiffs do not believe was true as no Plaintiff in this litigation was aware of any complaint about Hassan's body odor from any other TLC cadet.

64.     Inspector Donoso also accused Hassan, often in front of other cadets, of having body odor and putting toilet paper in the urinal.

65.     Donoso told Hassan several times he would "never pass this academy" and should just resign.

66.     Hassan endured discriminatory comments about his alleged body odor throughout his time working at TLC.

67.     The alleged body odor comments only stopped during his tenure at the Woodside facility in the Fall of 2018, when Hassan told Squad Leader Edwin Medina ("Medina") that he would sue TLC if Medina ever made another comment about his alleged body odor again.

**DISCRIMINATORY TREATMENT INTENSIFIES DURING CADET TRAINING AT TLC WOODSIDE FACILITY**

68.     After about six weeks of training in the Bronx, Plaintiffs were assigned to the TLC facility in Woodside, Queens for more training and testing.

69.     At Woodside, the illegal discriminatory treatment continued and intensified.

70.     For example, Instructor Arnan Murphy ("Murphy") and Instructor Donoso both ridiculed Hassan and Hamza's accent, constantly telling them to "speak English" in a loud voice while laughing, even though Hassan and Hamza were speaking English to them at all times.

71.     Instructor Murphy also targeted Massoud with comments that exemplified his discriminatory bias.

72.     For example, one day Hassan and Sellam were waiting to use the microwave in the kitchen when they heard Instructor Murphy say about Massoud: "Fucking Arab, he thinks he's an American."

73.     The discriminatory harassment that Plaintiffs experienced at the TLC Woodside training facility occurred often during lunch and/or related to food.

74.     For example, one day during lunch, Sellam, Hassan and Massoud were standing in the kitchen area waiting to use the microwave to warm up food they had brought from home, when Instructor Murphy walked in and complained that it "smells ethnic in here."

75.     Instructor Murphy continued to make disrespectful comments about Plaintiffs' food throughout the time they were training as cadets at the Woodside facility, saying many times that "it stinks in here" as soon as Plaintiffs opened their lunch bags to eat.

76.     On another occasion, Massoud's lunch bag with his name on it went missing, and in its place, Massoud found an open package of oozing, spoiled ham.

77.     About a week later, another cadet, Shaquille Mitchell ("Mitchell"), found a piece of moldy ham in his lunch bag, which was left in the same general area in the refrigerator where Massoud routinely left his lunch bag.

78.     When Mitchell complaint about this incident, TLC merely issued a general warning to cadets that they were not to touch one another's belongings.

79.     Upon information and belief, TLC conducted no investigation into who stole Mitchell's lunch and why it had been replaced with spoiled pork, even though TLC supervisors knew the same misconduct happened to Massoud a week earlier when he reported it to them.

80.     During their training at the Woodside facility, Massoud and Hassan realized that TLC supervisors marked their answers on exams as "incorrect," when, in reality, their answers were right, which Hassan and Massoud noticed when they would go over the exams with their instructors in class.

81.     Hassan complained about having his correct exam answers marked wrong to Defendant Finkelstein, who told him not to worry about it, but otherwise, upon information and belief, Defendant Finkelstein did not do anything to address Hassan's complaint.

82.     However, even when TLC supervisors did not mark his correct exam answers wrong, Hassan's excellent work performance as a cadet was regularly undermined in an effort to humiliate him because of his status as a foreign-born Arab Muslim man over the age of 40.

83.     For example, TLC cadets were required as part of their training at the Woodside facility to pass a specific two-part exam consisting of a car stop and the drafting of a written summons. Hassan passed this exam with a perfect score of 100 percent.

84.     Yet instead of expressing support for Hassan because of this achievement, Instructor Donoso told him that he scored a perfect score because of "luck."

85.     Similarly, Instructor Selina Simmons ("Simmons") baselessly claimed Hassan must have cheated by having the exam answers in his pocket.

86.     After three weeks at the Woodside facility, Plaintiffs and the other TLC cadets in their class were sent to York College where they learned specific techniques such as use-of-force, arrest procedures (like handcuffing), expandable baton use and emergency driving procedures.

87.     The York College training was carried out and supervised by different instructors, not the TLC employees who supervised Plaintiffs in the Bronx or at the Woodside facility.

88.     Plaintiffs found the York College trainers to be professional and courteous at all times, and felt free from discriminatory treatment there, and thrived.

89.     For example, Massoud earned several awards for his excellent work performance, including being named Valedictorian of the cadet class, because he achieved an overall class score of 94.4 at York College, which was the highest grade.

90.     Massoud was informed that he was the Valedictorian by Instructor Hamlor, who went to York College to help prepare the cadets for their graduation from the training academy.

91.     Instructor Hamlor specifically told Massoud to mention him and thank him for the training he provided to the class in Massoud's Valedictorian speech.

92.     However, before the graduation ceremony, after returning to the Woodside facility, Defendant Finkelstein announced to the class that Massoud was not the Valedictorian and that Wilson Ramirez ("Ramirez"), another cadet, had earned that position.

93.     Upon information and belief, Ramirez, is not Arab, Muslim or foreign-born.

94.     Ramirez received a class grade of 93.7 at York College, earned grades on his car stop tests that were comparable to Massoud, but somehow was afforded the rank of second (2nd) in Plaintiffs' cadet class (after Luis Morales ("Morales") who, upon information and belief, was ranked first in the class but not afforded the honor of Valedictorian because he had been forced by TLC to re-take the cadet class because of failing grades earned during a prior class).

95.     Upon information and belief, Ramirez is related to Captain Elizabeth Ortiz, a TLC employee.

96.     Despite having the highest grade at York College, Massoud was ranked thirteenth (13th) in his cadet class.

97.     Cadets with a demonstratively worse performance record were afforded a higher rank than Massoud.

98.     For example, Katelyn Kelly ("Kelly"), whose mother, Cynthia Martin, is a book keeper at the TLC facility in Woodside, was ranked as fourth (4th) in Plaintiffs' cadet class  despite the fact that Kelly crashed the car she was driving on the testing track several times during training.

99.     In or about January 2018, Hassan sent an anonymous e-mail to the TLC Commissioner, then- Commissioner Meera Joshi ("Joshi"), in which he complained about the discriminatory mistreatment of certain members of the cadet class:

**From:** Louslous Louslous [mailto:louslous@zoho.com]
**Sent:** Thursday, January 25, 2018 9:06 AM
**To:** TLC Commissioner (TLC) <tlccommissioner@tlc.nyc.gov>
**Subject:** Complaints about TLC cadets class


First of all I would like to thank u for allowing me take some time from u,I prefer to keep my identity hidden as I am scare of retaliation against me and the group I present.We had the worst treatment I had ever seen in my life since I came to America 20 years ago ,u can not believe how much dicrmination in this class against Us as there is 2 kind of treatment for those Spanish and all other class as If I try to ask any question they started laughing and mocking us in very reticulous way that no can accept it on the other hand if the other group speak or answer question ...it is good question and genius !!!!

The only 4 people left the class and were forced to do that is belonging to our group as they can not take it any more .The combined stress and anxiety on our group is so much exaggerated and they keep telling us 24/7 we are going to fail u,u do not deserve to stay here and do not ever make a complaint as chain of command must be only with us ......this too too much .the instructors are not qualified for any tetaching skills or knowledge the only thing they can do scream and cursing and some of them are so races and even there is no study material to be universal for student as all of them up to their thinking.and nowadays they keep telling us please please step back this job is not for u even if u pass the peace officer we will fail u in car stop ....no way to be acceped in TLC .,,,we are going only to take 10 people and we already select them ...!!!!!

this the daily routines for us every single day and I have a huge question if this is TLC policy ....so why we get accepted from the beginning.

Even in car stop they never taught us principles only driver with gun or knife and passenger with gun or knife !!!!

Again I am sorry to take some time of yours as me and my group which we represent more than 26 cadets feel very bad and even we are not happy anymore with our job and we feel very bad about it .

We are all US citizens work hard to support our families and we should deserve mutual respecting environment to be able to work .

Sent using Zoho Mail

100.     Neither Commissioner Joshi nor anyone else at TLC ever sent Hassan an e-mail asking for his identity or for more information about his complaint, which, upon information and belief, was ignored.

101.     However, Commissioner Joshi's office did receive Hassan's complaint because Elaine C. Moore, the Commissioner's assistant, responded to Hassan's e-mail with a note that states: "Ok. I got it."

## INTENSE HOSTILE WORK ENVIRONMENT AT TLC STATEN ISLAND FACILITY

102.     After graduation, Plaintiffs' cadet class was split up into different squads.

103.     Hassan, Massoud and Sellam were all assigned to TLC's Staten Island facility.

104.     On their last day at the Woodside facility before they began work at TLC's Staten Island facility, TLC Fleet and Facilities Director Janine Williams ("Williams") warned Massoud, Sellam and Hassan to "take good care" and to "be careful in Staten Island" because there is "this guy [who] is racist."

105.     Plaintiffs, who were by the door of the Woodside facility when Williams addressed them, stopped and turned around to ask her for more information but she refused to name the "racist" TLC employee she was warning them about.

106.     As soon as Plaintiffs arrived in Staten Island, they encountered an intense hostile work environment.

107.     On their first day in Staten Island, Plaintiffs' direct supervisor, Captain John Demonte ("Demonte"), directed them to use the women's locker room, even though there was enough space in the men's locker room and all of the other TLC officers used it.

108.     Every time Hassan, Massoud and Sellam used the women's locker room to change into or out of their work uniforms, they heard laughter from outside and felt humiliated.

109.    In addition, neither Hassan, Massoud nor Sellam were ever issued keys to enter the building at the Staten Island facility, unlike every other TLC employee who worked there.

110.    Instead, on a daily basis, Plaintiffs had to walk around the building, knock on the window, and hope that someone heard them and was courteous enough to open the door and let them inside.

111.    Plaintiffs complained to Captain Demonte about the daily stress of trying to enter and punch-in on time without a reliable way to get into the TLC facility.

112.    Captain Demonte told Plaintiffs he informed Defendant Finkelstein about the issue but Finkelstein refused to issue the keys to Plaintiffs.

113.    Captain Demonte specifically told Plaintiffs to stop complaining about the discriminatory harassment they were subjected to, claiming "you are lucky to have this job" because "you do not belong here" and "you are too old."

114.    Captain Demonte also subjected Plaintiffs to other comments that demonstrated his discriminatory bias.

115.    For example, Captain Demonte knocked on the women's locker room door one day and called out: "Hey sleeper cell!" when he wanted to speak with Sellam.

116.    Sellam, who emigrated to the United States after the attacks on September 11, 2001, did not know what "sleeper cell" meant and Massoud had to explain the term to him.

117.    Other acts of discriminatory treatment by Captain Demonte include his threats to discipline Hassan for praying after his shift ended, on his own time, in the locker room or an empty conference room, which lasted for a few minutes each time.

118.    Captain Demonte threatened Hassan with discipline for praying on his own time on three or four different occasions.

119.    When Captain DeMonte found Hassan praying, he accused Hassan of "stealing time" and told Hassan never to pray at work again or he would be written-up.

120.    Captain DeMonte and other supervisors at the State Island facility also undermined Hassan's success by falsely accusing him of being "lazy" and disinterested in his work.

121.    However, the reality of Hassan's work performance was different. Hassan followed TLC rules that require trainees, who are no longer considered cadets but not yet considered certified to work as inspectors, to observe more senior employees at work to acquire on-the job training that cannot be taught in a classroom setting.

122.    Captain DeMonte and his subordinates contravened TLC rules by constantly urging Plaintiffs and other TLC trainees to actually perform inspector duties such as driving TLC vehicles and participating in enforcement stops. They did this even though Plaintiffs and the other TLC trainees were not eligible for workers' compensation yet, and if they had been injured on the job, they would have been unable to receive workers' compensation benefits.

123.    In addition to Captain Demonte, other TLC supervisors subjected Plaintiffs to discriminatory harassment while they worked at the TLC Staten Island facility.

124.    In Staten Island, Plaintiffs rode with senior inspectors on a daily basis.

125.    Whenever any Plaintiff rode with Officer John Desantis ("Desantis"), he would engage in extremely unprofessional conduct, such as yelling at Hassan and saying "What the fuck are you looking at?" any time Hassan looked in his general direction.

126.    One day, while working by the Staten Island Ferry, Officer Desantis went so far as to threaten to kill Hassan if he made eye-contact with him again.

127.    When Massoud tried to ask Officer Desantis a work-related question while riding with him, Desantis would raise his voice, yell "Stop!" or " I'll tell you later" but would never take the time to explain anything, even though it was his duty to provide on-the-job training.

128.    Back at the TLC Staten Island facility, Massoud and Sellam heard Officer Desantis say "they need to be waterboarded" as they walked by his cubicle one day.

129.    Massoud also heard DeSantis make racist statements about "fucking liberals" and their "black babies" and his resentment because "we need to pay for them."

130.    Hassan witnessed Officer DeSantis subject TLC-licensed drivers to discriminatory conduct. For example, in or about July 2018, Officer DeSantis flagged down a random taxi, and issued the foreign-born looking driver a summons for no reason Hassan could understand.

131.    Captain DeMonte, who was also present, condoned Officer DeSantis' misconduct by telling the driver not to complain about the summons and ended the conversation by saying, "Welcome to America!," in a manner that suggested the driver was not actually welcome.

132.    On another day, after Roll Call, Officer Desantis opened the door of his TLC vehicle, looked to see if anyone was coming and swung the door open with such force that he damaged the door of Massoud's private vehicle.

133.    Massoud ran up to Officer Desantis and asked, "Why did you do that?" and Officer Desantis falsely replied that the dent he was complaining about was already there.

134.    Massoud complained about Officer Desantis' "they need to be waterboarded" comment and the intentional damage he caused to his personal vehicle to Lt. John DiCostanza ("DiCostanza"), another supervisor, who said he would report the incidents to Captain Demonte, but, upon information and belief, Officer Desantis was not reprimanded for his misconduct.

135.    Upon information and belief, Officer Desantis was not reprimanded for his discriminatory mistreatment of Plaintiffs even though he has a history of targeting TLC employees who are Arab/Muslim/foreign-born, including an inspector originally from Morocco (or of Moroccan descent), who was physically assaulted by DeSantis during work hours. This incident occurred before Plaintiffs began working at the Staten Island facility.

136.    Plaintiffs believe DeSantis is the TLC employee who Williams warned them about before they left the Woodside facility.

137.    Like Hassan, Massoud was also subjected to discriminatory comments about his age and his being allegedly unfit to work as a TLC inspector.

138.    For example, in October 2018, Captain Demonte began assigning Massoud to patrol cars infested with cockroaches, which would run all over him and get into his clothes.

139.    When Massoud showed a video of cockroaches running around on the center console of the TLC cruiser he was driving to Defendant DeFrancis ("DeFrancis"), TLC's Chief of Patrol, DeFrancis laughed, said "he heard about it," and then discouraged Massoud from taking his complaints any further.

140.    Defendant DeFrancis threatened Massoud, saying, "What are you doing here? When I was your age, I retired from the NYPD."

141.    Defendant DeFrancis' office is located at TLC's Woodside facility where he displays a bobblehead of Donald Trump on his desk and greets those who enter his office with a message board that reads: "Make TLC Great Again!"

142.    Like Defendants Finkelstein and Pennetti, Defendant DeFrancis is a former NYPD officer and wears a gun to work at the TLC.

143.    However, unlike Defendants Finkelstein and Pennetti, Defendant DeFrancis wears his gun attached to his belt, making no effort to conceal it.

144.    In addition to being subjected to a hostile work environment, Massoud, Hassan and Sellam were also used as props by TLC during a public meeting because of their race, national origin and religion.

145.    In October 2018, all three Plaintiffs were summoned to TLC's Woodside facility on their day off by Deputy Pennetti and Chief Edwidge Joseph ("Joseph"), who told them they were going to work "undercover," with no shield, no bullet proof vest, or NYPD support, to infiltrate alleged "Spanish gangs" who were allegedly attempting to kill Commissioner Joshi at a public meeting.

146.    Deputy Chief Joseph has a documented history of racist conduct at TLC.

147.    For example, in 2014, before his promotion to Deputy Chief, Joseph was the highest-ranking TLC officer to be named in a lawsuit brought by a TLC-licensed driver, Haytham Shaban ("Shaban"), for allegedly violating his Constitutional rights.

148.    In his Complaint filed in federal court in New York, Shaban alleged that Deputy Chief Joseph and other TLC officers subjected him to an unlawful stop and physical abuse during which one officer is alleged to have screamed at him: "I hate you fucking Muslims!"

149.    Despite what Defendant Pennetti and Deputy Chief Joseph told them, Plaintiffs and other TLC employees were sent to a Town Hall meeting on or about October 14, 2018 to fill seats, and in doing so, deprive space that could have been taken by real taxi and black car drivers at an event created to give them an opportunity to discuss with Commissioner Joshi oppressive TLC policies and procedures that have caused a number of for-hire vehicle drivers in New York City to commit suicide in recent years, a phenomena that has been well-documented in the press.

150.    At around the time of the Town Hall meeting with Commissioner Joshi, in or about October 2018, Hassan, Massoud and Sellam were all required to sign agreements that extended their training period, without TLC providing any explanation.

151.    During the same time period, Hassan requested a meeting with Defendant Pennetti, during which he complained about discriminatory treatment by DeMonte and other TLC supervisors at the Staten Island facility.

152.    Defendant Pennetti ignored Hassan's complaints about discrimination.

153.    Instead, Defendant Pennetti focused on what Hassan told her about Captain DeMonte's failure to encourage compliance with TLC rules regarding car stops and the inappropriate work he assigned to inspectors-in-training like Hassan and the other Plaintiffs, who DeMonte made drive TLC cars and get involved in car stops when they should have been observing more senior inspectors until their probationary period came to an end.

154.    Upon information and belief, Defendant Pennetti used the information about DeMonte's inappropriate management of the Staten Island facility that Hassan provided to her to force DeMonte into an early retirement.

155.    After DeMonte's removal from his position, every TLC employee assigned to the Staten Island facility was reassigned to another facility.

156.    Without any explanation, all of the inspectors and inspectors-in-training from the Staten Island facility, including Massoud and Sellam, were issued disciplinary write-ups for failing to make proper car stops.

157.    Upon information and belief, Hassan was the only TLC employee from the State Island facility who did not receive the disciplinary write-up relating to car stops.

158.    However, unlike the senior inspectors at the Staten Island facility, who had completed their training, Massoud and Sellam, who did receive write-ups were not certified to make stops or car inspections themselves.

159.    Massoud and Sellam were reassigned to Woodside where the discriminatory mistreatment continued.

160.    For example, while Massoud and Sellam were riding with Lt. Jose Torres ("Torres") one day, Torres told Massoud in a raised voice to speed up the car he was driving to "stop that fucking Arab," referring to a taxi driver wearing a head covering, who was likely an adherent to Sikhism, and not an Arab.

161.    After Massoud and Sellam told Lt. Torres that they are Arab, he seemed stunned but apologized for his discriminatory comment.

162.    On or about November 16, 2018, Sellam and Massoud took advantage of the alleged open door policy of Defendant Pennetti and went to her office to complain about the discriminatory treatment they had experienced during their tenure at TLC.

163.    Sellam and Massoud specifically complained about their forced participation in the Town Hall for drivers with Commissioner Joshi, among other incidents.

164.    As they spoke, Defendant Pennetti became noticeably disturbed, refused to respond to the allegations of discriminatory harassment that Massoud and Sellam were describing, and encouraged them to leave her office, which they immediately did do as instructed.

**PLAINTIFFS WERE FIRED FOR ENGAGING IN PROTECTED ACTIVITY**

165.    A few days after they complained to Defendant Deputy Commissioner Pennetti, Massoud and Sellam was required to attend interviews at the TLC Headquarters on Beaver Street regarding car stops they had witnessed while employed at the TLC facility in Staten Island.

166.   During these interviews, Massoud and Sellam were told that they would be reassigned to new squads because the Staten Island facility was being shut down.

167.   Massoud and Sellam were interviewed by several high-level TLC officials, including Defendant Goldapper, whose title is TLC Director of Discipline and Labor Relations, during the morning of November 20, 2018.

168.   At 2:18 p.m. that same afternoon, Defendant Goldapper sent an e-mail to Melissa Marrero ("Marrero"), a human resources officer, in which he alleged that both Sellam and Massoud "lied" during their interviews that day, without further expounding on how he knew they lied.

169.   In the e-mail to Marrero, Defendant Goldapper noted that he had informed Defendant Pennetti about the interviews and also had recommended the termination of employment of Massoud and Sellam for allegedly "failing to satisfactorily complete their probationary period," which Defendant Pennetti allegedly agreed to.

170.   When Sellam and Massoud returned to the Woodside facility immediately after their interviews at TLC Headquarters, they were informed by Defendant DeFrancis that their employment with TLC was being terminated.

171.   When Massoud asked why he was being fired, Defendant DeFrancis said he did not need a reason to fire them and if Massoud or Sellam ever wanted to work for the City again, they should sign the paperwork presented to them, which were TLC-authored resignation forms.

172.   Sellam and Massoud were then made to undress in front of several TLC supervisors to whom they had to give their ballistic vests.

173.   As Sellam and Massoud were changing into their street clothes, the door to the locker room was held open so that everyone passing by could see them in their underwear.

174.    Sellam and Massoud were then handed a black garbage bag to put their personal belongings into and escorted out by Instructor Donoso like they had done something wrong.

175.    Hassan was illegally fired ten (10) days after Sellam and Massoud.

176.    Unlike Sellam and Massoud, by October 2018, Hassan was one of six other cadets who were permitted to complete all of the tests required to become certified inspectors and "Special Patrolman," which required a special background check certified by the NYPD.

177.    However, like Sellam and Massoud, Hassan was still required to execute an agreement extending his probationary period for another six (6) months without explanation.

178.    Despite still being on probation, Hassan worked as an inspector on Squad 1, which was based out of the Woodside facility and patrolled the John F. Kennedy Airport ("JFK"), starting in or about October 2018.

179.    During his tenure on Squad 1, Hassan excelled at his work, issuing over one hundred (100) summonses, and he took part in two (2) arrests.

180.    However, even while working as part of Squad 1, Hassan continued to be subject to discriminatory harassment.

181.    For example, for meals, Hassan was expected to eat with his squad and most of the officers insisted on going to Latin American restaurants.

182.    When Hassan asked if he could go to a restaurant that served halal food, he was told by the Squad 1 supervisor, Sylvester Atuegbu ("Atuegbu"), not to complain.

183.    On one occasion, when another inspector agreed to go with Hassan to a restaurant that served halal food, they were encouraged to take a TLC vehicle by Lt. James Harris.

184.    However, later that day, Squad 1 Supervisor Atuegbu issued to Hassan a disciplinary write-up for allegedly moving a TLC vehicle without permission, even though Hassan was not the driver.

185.    Hassan was also treated differently than other inspectors by Squad 1 Supervisor Atuegbu.

186.    For example, when Squad 1 would go to JFK for a regular patrol, Atuegbu required Hassan to stay in the van while all of the other officers were allowed to patrol the airport.

187.    On or about November 30, 2018, Hassan was summoned to a meeting with Defendant DeFrancis during which he was told that he would not pass probation, although DeFrancis did not specify anything about Hassan's work performance that was problematic.

188.    Like Massoud and Sellam, Hassan was told by Defendant DeFrancis that if he did not sign a TLC-authored document saying that he voluntarily resigned from his job, he would never work for the City again.

189.    Hassan refused to sign the resignation form and Defendant DeFrancis fired him.

190.    TLC engaged in illegal post-termination retaliation against Plaintiffs by trying to have their claims for unemployment compensation denied by falsely stating that each Plaintiff was fired for engaging in intentional misconduct.

191.    TLC has subjected Plaintiffs to more recent illegal post-termination retaliation.

192.    In or about May 2020, each Plaintiff received a letter from the New York State Division of Criminal Justice Services notifying them that TLC reported that they were each fired for "incompetence or misconduct," and as a result, each Plaintiff's peace officer basic training certification was now deemed invalid.

193.    As a result of the hostile work environment and retaliatory treatment of Defendants, Plaintiffs have experienced economic loss as well as depression, anxiety and anger for which they have received medical treatment for the first time in their lives.

## COUNT I

## HOSTILE WORK ENVIRONMENT BASED ON RACE
## IN VIOLATION OF TITLE VII AGAINST DEFENDANT CITY OF NEW YORK

187.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

188.    At all relevant times to this action, Defendant City of New York employed Plaintiffs within the meaning of the Title VII.

189.    By the acts and practices described herein, which caused Plaintiffs to be subjected to a hostile work environment because of their race, the City of New York violated Title VII.

190.    Plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendant City of New York's illegal practices.

## COUNT II

## HOSTILE WORK ENVIRONMENT BASED ON RELIGION
## IN VIOLATION OF TITLE VII AGAINST DEFENDANT CITY OF NEW YORK

191.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

192.    At all relevant times to this action, Defendant City of New York employed Plaintiffs within the meaning of the Title VII.

193.    By the acts and practices described herein, which caused Plaintiffs to be subjected to a hostile work environment because of their religion, the City of New York violated Title VII.

194.    Plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendant City of New York's illegal practices.

## COUNT III

### HOSTILE WORK ENVIRONMENT BASED ON NATIONAL ORIGIN IN VIOLATION OF TITLE VII AGAINST DEFENDANT CITY OF NEW YORK

195.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

196.    At all relevant times to this action, Defendant City of New York employed Plaintiffs Sellam and Hassan within the meaning of the Title VII.

197.    By the acts and practices described herein, which caused Plaintiffs Sellam and Hassan to be subjected to a hostile work environment because of their national origin, Defendant City of New York violated Title VII.

198.    Plaintiffs Sellam and Hassan have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendant City of New York's illegal practices.

## COUNT IV

### RETALIATION IN VIOLATION OF TITLE VII AGAINST DEFENDANT CITY OF NEW YORK

199.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

200.    At all relevant times to this action, Defendant City of New York employed Plaintiffs within the meaning of Title VII.

201.    By retaliating against Plaintiffs for engaging in protected activity when they complained about a discriminatory hostile work environment, which includes but is not limited to

baseless accusations raised against Plaintiffs by TLC supervisors about their allegedly deficient work performance and alleged insubordination, leading to their retaliatory termination of employment and post-termination retaliatory treatment, Defendant City of New York violated Title VII.

202.    Plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendant City of New York's illegal practices.

## COUNT V

### HOSTILE WORK ENVIRONMENT BASED ON RACE
### IN VIOLATION OF NYCHRL AGAINST ALL DEFENDANTS

199.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

200.    At all relevant times to this action, Defendants City of New York, DeFrancis, Finkelstein, Goldapper, and Pennetti employed Plaintiffs within the meaning of the NYCHRL.

201.    Defendants City of New York, DeFrancis, Finkelstein, Goldapper, and Pennetti intentionally discriminated against Plaintiffs because of their race by subjecting Plaintiffs to a hostile work environment because of their race and/or condoning the racist mistreatment they were subjected to by other TLC employees, which they failed to remediate when Plaintiffs complained to them about it in violation of the NYCHRL.

202.    The race-related hostile work environment that Plaintiffs were subjected to at TLC involved discriminatory mistreatment that rose above the level of petty slights and trivial inconveniences. Accordingly, Defendants discriminated against Plaintiffs on the basis of race in violation of the NYCHRL.

203.    As supervisory employees, Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti are personally liable for their own illegal discriminatory conduct, and the aiding and abetting of TLC's discriminatory treatment of Plaintiffs by others under their supervision, pursuant to N.Y.C. Admin. Code § 8-107.

204.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiffs' statutorily protected rights.

205.    Plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendants' illegal practices.

## COUNT VI

### HOSTILE WORK ENVIRONMENT BASED ON RELIGION
### IN VIOLATION OF NYCHRL AGAINST ALL DEFENDANTS

206.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

207.    At all relevant times to this action, Defendants City of New York, DeFrancis, Finkelstein, Goldapper, and Pennetti employed Plaintiffs within the meaning of the NYCHRL.

208.    Defendants City of New York, DeFrancis, Finkelstein, Goldapper, and Pennetti intentionally discriminated against Plaintiffs because of their religion by subjecting Plaintiffs to a hostile work environment because of their religion and/or condoning the discriminatory mistreatment they were subjected to by other TLC employees because of their religion, which they failed to remediate when Plaintiffs complained about it to them, in violation of the NYCHRL.

209.    The religion-related hostile work environment that Plaintiffs were subjected to at TLC involved discriminatory mistreatment that rose above the level of petty slights and trivial

inconveniences. Accordingly, Defendants discriminated against Plaintiffs on the basis of religion in violation of the NYCHRL.

210.    As supervisory employees, Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti are personally liable for their own illegal discriminatory conduct, and the aiding and abetting of TLC's discriminatory treatment of Plaintiffs by others under their supervision, pursuant to N.Y.C. Admin. Code § 8-107.

211.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiffs' statutorily protected rights.

212.    Plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendants' illegal practices.

<u>**COUNT VII**</u>

**HOSTILE WORK ENVIRONMENT BASED ON NATIONAL ORIGIN
IN VIOLATION OF NYCHRL AGAINST ALL DEFENDANTS**

213.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

214.    At all relevant times to this action, Defendants City of New York, DeFrancis, Finkelstein, Goldapper, and Pennetti employed Plaintiffs Sellam and Hassan within the meaning of the NYCHRL.

215.    Defendants City of New York, DeFrancis, Finkelstein, Goldapper, and Pennetti intentionally discriminated against Plaintiffs Sellam and Hassan because of their national origin by subjecting Plaintiffs to a hostile work environment because of their national origin and/or condoning the mistreatment they were subjected to by other TLC employees because of their

national origin, which they failed to remediate when Plaintiffs complained about it to them, in violation of the NYCHRL.

216.    The national origin-related hostile work environment that Plaintiffs Sellam and Hassan were subjected to at TLC involved discriminatory mistreatment that rose above the level of petty slights and trivial inconveniences. Accordingly, Defendants discriminated against Plaintiffs Sellam and Hassan on the basis of their national origin in violation of the NYCHRL.

217.    As supervisory employees, Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti are personally liable for their own illegal discriminatory conduct, and the aiding and abetting of TLC's discriminatory treatment of Plaintiffs Sellam and Hassan by others under their supervision, pursuant to N.Y.C. Admin. Code § 8-107.

218.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiffs' statutorily protected rights.

219.    Plaintiffs Sellam and Hassan have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendants' illegal practices.

## COUNT VIII

**HOSTILE WORK ENVIRONMENT BASED ON AGE
IN VIOLATION OF NYCHRL AGAINST ALL DEFENDANTS**

220.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

221.    At all relevant times to this action, Defendants City of New York, DeFrancis, Finkelstein, Goldapper, and Pennetti employed Plaintiffs Sellam and Hassan within the meaning of the NYCHRL.

222.    Defendants City of New York, DeFrancis, Finkelstein, Goldapper, and Pennetti intentionally discriminated against Plaintiffs Massoud and Hassan because of their age by subjecting Plaintiffs Massoud and Hassan to a hostile work environment because of their age and/or condoning the mistreatment they were subjected to by other TLC employees because of their age, which they failed to remediate when Plaintiffs complained about it to them, in violation of the NYCHRL.

223.    The age-related hostile work environment that Plaintiffs Massoud and Hassan were subjected to at TLC involved discriminatory mistreatment that rose above the level of petty slights and trivial inconveniences. Accordingly, Defendants discriminated against Plaintiffs Massoud and Hassan on the basis of their age in violation of the NYCHRL.

224.    As supervisory employees, Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti are personally liable for their own illegal discriminatory conduct, and the aiding and abetting of TLC's discriminatory harassment of Plaintiffs Massoud and Hassan by others under their supervision, pursuant to N.Y.C. Admin. Code § 8-107.

225.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiffs' statutorily protected rights.

226.    Plaintiffs Massoud and Hassan have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendants' illegal practices.

## **COUNT IX**

**RETALIATION IN VIOLATION OF THE NYCHRL AGAINST ALL DEFENDANTS**

223.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

224.    Each Plaintiff engaged in protected activity as that term is defined by the NYCHRL.

225.    Because of this protected activity, Defendants took adverse actions against Plaintiffs, which include but is not limited to documenting baseless accusations raised against Plaintiffs by TLC supervisors about their alleged deficient work performance and alleged insubordination, leading to their retaliatory termination of employment and post-termination retaliatory treatment, in violation of the NYCHRL.

226.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiffs' statutorily protected rights.

227.    Plaintiffs has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendants' illegal retaliation.

## COUNT X

**DEPRIVATION OF FEDERAL RIGHTS UNDER 42 USC §1983 AGAINST DEFENDANTS DEFRANCIS, FINKELSTEIN, GOLDAPPER, and PENNETTI**

228.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

229.    Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti subjected Plaintiffs to illegal discriminatory harassment and illegal retaliatory treatment for engaging in protected activity, which was carried out in their official capacity under color of state law.

230.    The illegal discriminatory harassment and retaliation attributed to Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti, as alleged herein, deprived Plaintiffs of their rights and privileges guaranteed by Title VII of the Civil Rights of 1964, as amended, 42 U.S.C. § 2000e *et seq*. and in violation of 42 U.S.C. § 1983.

231.    The illegal discriminatory harassment and retaliation attributed to Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti, as alleged herein, was carried out by Defendant

DeFrancis, Finkelstein, Goldapper, and Pennetti in their capacity as TLC officials and supervisors, with all of the apparent and/or actual authority attended thereto.

232.     The illegal discriminatory harassment and retaliation complained of herein, which is attributed to Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti, was carried out by Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti in their capacity as TLC officials and supervisors pursuant to the customs, usages, practices, procedures and rules of Defendant City of New York and Defendant TLC, all under the supervision of Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti and other ranking officers of Defendant TLC.

233.     Defendants DeFrancis, Finkelstein, Goldapper, and Pennetti, while acting under color of state law, engaged in illegal discriminatory harassment and retaliation which constitute a custom, usage, practice, procedure or rule of Defendant City of New York and/or Defendant TLC, which is forbidden by Title VII and the United States Constitution.

## **JURY DEMAND**

140. Plaintiffs demand trial on all issues triable by a jury.

WHEREFORE, Plaintiffs respectfully request that this Court grant them injunctive relief to enjoin and permanently restrain Defendants from violating their civil rights under Title VII, Section 1983, and the NYCHRL again; declare that the acts and practices complained of herein are in violation of Title VII, Section 1983, and the NYCHRL; render a judgment sufficient to compensate them for economic, emotional and psychic injuries, humiliation, suffering, insult to dignity, and to provide necessary treatment; and to punish Defendants for their violation of the law and to deter similar violations in the future; grant Plaintiffs such interest as in permitted by law; attorneys' fees

and all other costs associated with bringing this action against Defendants; and, all such additional

relief as this Court may deem just and appropriate under the circumstances.

Dated: August 3, 2020

Respectfully submitted,

LAW OFFICE OF DANIELA NANAU, P.C.

_____
DANIELA NANAU

89-03 Rutledge Avenue
Glendale, New York 11385
Telephone: (888) 404-4975
E-Mail: dn@danielananau.com

ATTORNEYS FOR PLAINTIFFS